IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

MARVIN BROWN,

        Plaintiff,

v.                                                                         CIV 02-32 JP/KBM

PHILLIP MARES, et al.,

        Defendants.

# PARTIAL PROPOSED FINDINGS AND RECOMMENDED DISPOSITION AND ORDER TO FILE SUPPLEMENTAL MARTINEZ REPORT

This matter is before the court on a *Martinez* Report that covers Plaintiff's three remaining claims against the four remaining Defendants. *See Docs. 27, 33.* Defendants did not file a separate motion for summary judgment, but the *Martinez* Report does request that summary judgment be entered in their favor. *Doc. 33* at 14. I recommend that Plaintiff's length of confinement and First Amendment Ramadan meals claims be dismissed, and order further briefing on his claim regarding First Amendment/Equal Protection congregate religious services.

## I. *Martinez* Report & Summary Judgment Practice

One of the purposes of a *Martinez* Report is to determine whether a prisoner has a meritorious claim. A *Martinez* Report may be used in a variety of contexts, including a motion for summary judgment or *sua sponte* entry of summary judgment. Because Defendants' *Martinez* Report is used for summary judgment purposes, Plaintiff must be afforded an opportunity to present conflicting evidence to controvert the facts set forth in the report. *See Doc. 27* at 2.

Here, Plaintiff submitted an "affidavit"[1] and a number of documents in opposition to Defendants' Answer, as well as a lengthy opposition to the *Martinez* Report. I have considered all of these materials in arriving at my recommendation and order. *See Docs. 20, 24, 25, 36.*

A *Martinez* Report cannot be used to resolve disputed issues of fact. *See Nickelberry v. Pharoah,* 2000 WL 985665 at *1 (10th Cir. 2000) (citing *Hall v. Bellmon,* 935 F.2d 1106, 1109 (10th Cir. 1991)). Likewise, summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. . . . A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *Sports Unlimited, Inc. v. Lankford Enter., Inc.,* 275 F.3d 996, 999 (10th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

---

[1] None of Plaintiff's "affidavits" are notarized. *See Docs. 24, 36.* Plaintiff recites that his affidavits are "sworn" and indicates that he is giving a "deposition." The affidavits are detailed. It is apparent that the contents of the affidavits are based on what Plaintiff would assert is his personal knowledge. In swearing to the contents of his affidavits, Plaintiff thus makes a representation similar to that in his verified complaint that he is making the assertions under "penalty of perjury . . . that the information contained in [them are] true and correct." *Complaint* at 66. With the understanding that Plaintiff has personal knowledge of the information given in his affidavits and that he swears to the contents under penalty of perjury, I consider the affidavits as complying with FED. R. CIV. P. 56(e) . *See Hall v. Bellmon,* 935 F.2d 1106, 1111 (10th Cir. 1991) (verified pleading, such as complaint, "may also be treated as an affidavit if it alleges facts based on the plaintiff's personal knowledge and has been sworn under penalty of perjury."); *Jaxon v. Circle K Corp.,* 773 F.2d 1138, 1139 n. 1 (10th Cir.1985) ("We note that Jaxon had affirmed the truth of the allegations in his complaint while under oath during his deposition . . . . A verified pleading may itself be treated as an affidavit if the facts asserted are within the pleader's personal knowledge."); *compare Barkus v. Kaiser,* 229 F.3d 1162 (10th Cir. 2000) (unpublished) ("the district court could rely on the *Martinez* report in dismissing the complaint because Mr. Barkus made conclusory and unsworn allegations in his attempt to controvert the report's factual findings" citing *Vestar v. Hudson,* 216 F.3d 1086, 2000 WL 702872, at *2 (10th Cir. May 26, 2000) (unpublished opinion); *Olson v. Coleman,* 993 F.2d 1551, 1993 WL 141135, at * 1 (10th Cir. April 28, 1993) (unpublished opinion).").

(1986)). The Court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment, but that party must identify sufficient evidence" that would justify sending the case to a jury. *Williams v. Rice*, 983 F.2d 177, 179 (10th Cir. 1993) (citing *Anderson,* 477 U.S. at 249-52).

**II. Length Of Stay In Administrative Segregation Does Not Violate Eighth Amendment**

Plaintiff's Complaint asserts that he has been confined in administrative segregation for over five years based on the information from a confidential informant, but has never been given a disciplinary hearing where he could challenge that information. He further complains that legal materials and other property were not returned to him, and that as a result of his classification, he cannot attend religious services or otherwise associate with the general population and visit the law library. *See Complaint,* ¶¶ 79-91. He submitted a number of documents in this regard. *See Doc. 25,* Exhs. A, C, E, F-N. Indeed, his lengthy response to the *Martinez* Report is almost entirely devoted to this issue. *Doc. 36* (and exhibits thereto).

However, this is not a new claim. I note that Plaintiff's suggestion that he has been left to languish for five years in administrative segregation is misleading. My proposed findings in a prior suit recount the history of Plaintiff's classification and placement status and demonstrated the efforts the prison made to reclassify and/or transfer Plaintiff to a different facility. He is presently back in New Mexico after his return from an out-of-state prison.[2]

---

[2] The prior findings provided in part:

> Plaintiff was afforded a classification review, at the most, within four months of his original classification by the Administrative Segregation Classification Committee, which voted that he be released to the general population. On November 6, 1997, however, Warden LeMaster overruled the recommendation . . . .

3

In that prior suit, District Judge Bruce Black resolved the issue of his placement in administrative segregation. The Tenth Circuit affirmed this court's decision that the claim had no merit because Plaintiff's confinement in administrative segregation did not give rise to a liberty interest under *Sandin v. Conner,* 515 U.S. 472 (1995). *See Brown v. Williams,* CIV 97-825 BB/KBM (*Doc. 73*), *aff'd,* 28 Fed.Appx. 808, 2001 WL 1429384 (10th Cir. 2001).[3] Here,

* * * * *

> Thereafter the record reflects that the prison reviewed his status periodically as required by prison regulations, trying to find a more suitable placement than administrative segregation. Within six months of Warden LeMaster's decision, when Plaintiff had been in Administrative Segregation for one year, there were recommendations to transfer Plaintiff to other facilities.
>
> By the fall of 1998, it was determined that Plaintiff should be transferred to Hobbs, but he refused the transfer. He [still] maintained that he was not involved in the stabbing, that all the charges were dropped, and that the inmates involved in the 1997 altercation were out of prison. He requested placement in the "Western" facility or to stay where he was "North Facility in Administrative Segregation." If he were to be placed out of state, he wanted to go to Washington or Minnesota.
>
> By December 1998, because of a "lack of viable alternatives," out-of-state placement in Virginia was recommended. In February 1999, Plaintiff appealed that decision, again insisting that he wanted to go to the Western Facility, stay where he was, or be transferred to Washington or Minnesota. In June, the out-of-state placement was approved and Brown was transferred to Virginia on September 23, 1999. Less than one month later, he was transferred back to New Mexico for "court purposes" and retained his old classification. *Id.*; Exh. D133; *Doc. 48.*

*Brown v. Williams,* CIV 97-825 BB/KBM (*Doc. 73* at 9-11)

---

[3] My prior recommendation, which was adopted by the district judge, reasoned in part:

> Both before and after *Sandin,* the Tenth Circuit has held that placement in administrative segregation and ultimate transfer to a maximum security prison does not give rise to a protected liberty interest. . . . On this basis alone, Plaintiff's claim fails.

Plaintiff seeks again to litigate the facts surrounding the incidents that initially placed him in administrative segregation, the subsequent decisions that he remain there, and the conditions there. *See e.g., Doc. 25,* Exhs. I, J, K, N. Because he had the opportunity to litigate these issues in the prior suit and because it was decided against him, Plaintiff is precluded from relitigating them here. *E.g., United States v. Botefuhr,* 309 F.3d 1263, 1282 (10th Cir. 2002) (elements of issue preclusion).

Furthermore, Chief Judge James A. Parker already dismissed the due process aspect of the claim. *See Doc. 10.* As I read Judge Parker's order, the only remaining issue is whether Plaintiff's length of stay in administrative segregation violates the Eighth Amendment. *See id.* at

---

> I recognize that since the *Sandin* decision, there has been some discussion in unpublished opinions of the Tenth Circuit and in other circuits whether the duration and conditions of confinement in administrative segregation are factors to consider in deciding whether a liberty interest is implicated. . . . *[S]ee also McClary v. Kelly,* 4 F. Supp.2d 195 (W.D.N.Y. 1998). However, on the basis of the record before me, I find that the concerns raised by those decisions do not apply here.
>
> *[after recounting history of Plaintiff's placement]*
>
> Tenth Circuit decisions have found no liberty interests implicated in cases of administrative segregation for up to fifteen months, . . . . It is apparent that prison officials took steps to remove Plaintiff from administrative segregation within a year of his being placed there, but that Plaintiff opposed those efforts. *Penrod,* [94 F.3d at 1406] (no due process violation where prisoners would be moved from administrative segregation once they entered a program or found a job, but plaintiff had refused both alternatives). ***Moreover, Plaintiff has not shown that the administrative segregation was significantly different from the general population.*** . . .
>
> Having no liberty interest at stake in connection with his transfer and classification, all of Plaintiff's related due process claims [] fail under *Sandin.* . . .

*Brown v. Williams,* CIV 97-825 (*Doc. 73* at 9-12) (footnote and citation omitted, emphasis added).

5

2 ("Although Plaintiff's allegation of lengthy segregation may warrant further consideration as an Eighth Amendment claim, his 'level system' claim will be dismissed because he has no due process rights to a particular classification.").

Under the "level" system adopted March 2001, Plaintiff is classified as a "Level V" inmate and resides in administrative segregation. *See Martinez Report,* ¶ 6; *see also id.,* Exh. 24. This is the second most restrictive custody level in the system and is assigned to "inmates posing the greatest risk to institutional security and the safety of others." *Id.,* Exh. 21 at 3 (§ V(J)). Within the Level V classification there are different "steps," and each step carries increasingly more privileges. By maintaining consistent good behavior, an inmate in administrative segregation can progress through the different steps. *See id.* at 2 (§ V(H)). Indeed, it is possible for a Level V inmate to progress to the point where he can be reclassified and placed in the general population. "If a Level V inmate has met the requirements of the Special Control Unit Level V program in the opinion of the Unit Management Team and the Warden, the inmate will be referred to the Classification Bureau Chief for placement in general population." *Id.,* Exh. 22 at 13 (§ J.6.c.).

According to Plaintiff's records and the statement in Defendants' *Martinez* Report, Plaintiff has progressed to

> Step 4. At that step, Plaintiff is entitled to congregate tier activities within his housing unit and Step 4 is regarded as a possible transition into general population placement assuming that he maintains clear conduct, meets behavioral goals and his safety is not in jeopardy.

*Id.,* ¶ 6.a.; *see also id.,* Exh. 24 (documents dated 5/30/02 showing Plaintiff's progress to step 4). As a Level V, Step 4, Plaintiff has earned some significantly different privileges than inmates at lower Steps. He is now able to: spend ten dollars more at the canteen and buy five more food

6

items a week; recreate an additional day a week, outside, and in a group of up to six inmates; receive two more visits and telephone calls per month; participate in four group programs per week; work, if approved by the associate warden; receive personal reading materials from the library; and pick up his meals. *Id.,* Exh. 23 (attachment "Table of Services For Custody Levels V and VI) (hereinafter "*Table of Services*"). Moreover, the Table of Services demonstrates that administrative custody inmates like Plaintiff: are issued sufficient clothing, linens, and toiletries; may retain certain personal property such as clothing, photographs, religious items, and writing material; may borrow books from the library; may have cassette players and televisions; and may participate in educational programs and recreation, in groups if their level is high enough. *Id.*

The restricted living conditions under which Plaintiff has lived in New Mexico for several years do not satisfy the objective component of an Eighth Amendment violation. "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Wilson v. Seiter,* 501 U.S. 294, 304-05 (1991). The above "conditions" of administrative segregation do not deprive Plaintiff of any life necessities. *See e.g., id.* at 298. Indeed, other than the fact of his status as an inmate in administrative segregation, and the alleged restrictions on his First Amendment religious rights, analyzed below, Plaintiff does not challenge any specific condition in administrative segregation as violating the Eighth Amendment. *See Speed v. Stotts,* 941 F. Supp. 1051, 1056 (D. Kan. 1996) ("denial of privileges which normally accompanies confinement in administrative segregation does not amount to a denial of life's necessities or present a sufficiently serious potential for harm;" analyzing placement in administrative segregation and First Amendment free exercise of religion claims separately from conditions of administrative segregation claim under Eighth Amendment).

The Western District of New York has concluded that keeping an inmate in administrative segregation for almost four and one-half years under more restrictive conditions than those here, posed an atypical and significant hardship as a matter of due process. *McClary v. Kelly,* 4 F. Supp. 2d 195, 210 (W.D.N.Y. 1998). It did not consider the Eighth Amendment. The restrictions Plaintiff faces in administrative segregation do not present a "dramatic" departure from a general prison population and the distinctions do not give rise to a liberty interest.[4] It is well-settled that "[t]he due process rights of prisoners are subject to reasonable limitation or restriction in light of the legitimate security concerns of the institution . . . , and 'the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.'" *Penrod v. Zavaras,* 94 F.3d 1399, 1406 (10th Cir. 1996) (quoting *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)).

---

[4] As the Tenth Circuit held in an unpublished opinion

> Villarreal's only argument on this point was that the duration of his confinement in administrative detention was sufficiently long to "cause a major disruption in [his] environment.". . . Absent evidence that the actual conditions of confinement in administrative detention were ***dramatically different*** from those in the general population, ***we are unwilling to conclude that the duration of Villarreal's discretionary confinement, standing alone, triggered any protected liberty interest.*** [And in a footnote,] Villarreal alleges, for the first time, that during his confinement in administrative detention his telephone privileges were restricted and he was required to eat all of his meals alone in his cell. We conclude that such allegations, even if true, do not establish that the conditions of Villarreal's administrative detention were so different as compared with normal incidents of prison life as to give rise to a protected liberty interest. *See Blum v. Federal Bureau of Prisons,* 189 F.3d 477, 1999 WL 638232 at *3 (10th Cir. 1999) (table) (rejecting argument that restrictions on store privileges, telephone calls, and     access to a radio during disciplinary segregation were sufficient to create a protected liberty interest).

*Villarreal v. Harrison,* 201 F.3d 449, 1999 WL 1063830 (10th Cir. 1999) (emphasis added).

For these reasons, Plaintiff's administrative segregation claim is not only precluded as twice dismissed, it is also without merit either as a matter of "liberty" under a due process analysis or as a matter of "cruel and unusual punishment" under an Eighth Amendment conditions analysis.

### III.  Ramadan Meal In 2000

Plaintiff's next claim concerns Ramadan during 2000.  Muslim inmates in administrative segregation may participate in the Ramadan fast, which includes a pork-free meal served at the appropriate times.  Because Ramadan requires fasting between sunrise and sundown, the menu for such prison meals are designed to allocate a 2800-calorie-a-day intake over the course of two meals.  The after-sundown meals for Ramadan were distributed at the normal dinner time. *Martinez Report,* Exhs. 1, 4, 10, 15.

The record does not reflect whether the normal dinner time was before or after sundown as interpreted by the Muslim religion.  For obvious legitimate hygienic reasons, however, if sundown falls after the distribution time, the Ramadan evening meals would need to consist of a "sack meal" rather than a hot food tray.  As such, the inmate could keep the meal in his cell and eat it after sundown.  *See id.*

The prison meal provided adopted that approach here.  The evening "sack lunch" consisted of  "double portions" and the menus for the Ramadan period consisted of:  six ounces of meat; eight slices of bread; four packages of condiments; two pieces of fruit; four ounces of raw vegetables; one bag of chips; two deserts; and a sixteen ounce beverage.  *See id.*

A memorandum notified the inmates that they must request to participate in writing, which

9

Plaintiff did. *See id.,* Exh. 1; *see also id.,* Exhs. 5-6.[5] The memorandum also notified the inmates of two ways to terminate participation in the Ramadan fast. Inmates could either request in writing to be removed, or eat during regular meal times, in which case the prison would remove them from the list. *Id.,* Exh. 1. On the second day of the fast, Plaintiff complained to Defendant Ted Arana that, in Plaintiff's opinion, the Ramadan "sack meals" served in the evening were not double portions. Brown incorrectly interpreted the Ramadan procedures memorandum as providing an "evening sack meal" in addition to the evening hot meal. Thus, he mistakenly believed, and persistently insisted, that he should receive three Ramadan meals a day. When Brown was informed that he would receive only the two Ramadan meals which provided the same nutritional value as three usual meals, he decided to take the noon sack lunch and save it for consumption after sunset. *See id.,* Exhs. 1, 14, 16; *see also Doc. 25,* Exh. D.

According to Arana, Plaintiff stated that he wanted his evening meals, wanted to be removed from the Ramadan list, but refused to write a statement to that effect. *Martinez Report,* Exh. 7. Plaintiff's version of their discussion is not different in material respect. In a grievance he stated that "he told Arana "that if I was not going to receive my specified quantify of evening meal that I rather have all the meals and I would save the lunch meal until after sundown." *Doc. 25,* Exh. 6 (10/10/00 grievance).[6] Arana informed his supervisor Defendant Chet Edwards of the

---

[5] Department records list Plaintiff's religion as Christian, and 2000 marked the first time he requested to participate in Ramadan. *See id.,* Exh. 10. Nevertheless, it appears that when Plaintiff chose to embrace the Muslim religion, he did so sincerely, and desired to participate in Ramadan for religious reasons.

[6] His allegation that Arana called him a "Nigger Muslim" during this conversation, *Complaint* at ¶ 48, offensive as the epithet is, is not insufficient to amount to a constitutional violation. *See, e.g., Collins v. Cundy,* 603 F.2d 825, 827 (10th Cir. 1979).

problem.  Edwards twice directed Arana to secure a statement from Plaintiff and when Plaintiff refused, Edwards removed plaintiff from the Ramadan list.  *See Martinez Report,* Exh. 10.

Plaintiff's claim that Defendants interfered with his exercise of the Ramadan fast hinges entirely on his factual assertion that he was not getting sufficient nutrition.  *See Doc. 36* at 89.  However, that was simply his misperception.  Nothing contradicts Defendants' exhibits demonstrating that the two Ramadan meals consisted of 2800 calories a day.  Furthermore, Plaintiff chose to take the noon sack lunch thereby invoking the provision that took him off the list.  Under these circumstances the prison officials cannot be found to have unconstitutionally interfered with his First Amendment rights.  *See Martinez Report,* Exh. 16; *see also Complaint,* ¶ 61.  Accordingly, this claim should be dismissed.

### IV.  Congregate Religious Services Claim

In a July 2001 letter, Plaintiff requested permission to conduct and hold congregate Jumu'ah services on Fridays for inmates in the "South" facility where he is housed.  As the Supreme Court noted in *O'Lone v. Estate of Shabazz,* "Jumu'ah is commanded by the Koran and must be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer."  482 U.S. 342, 345 (1987) (citing the Koran 62:9-10).  Although the prison where Plaintiff is incarcerated does provide for Jumu'ah and other Muslim congregate services led by Amin Abdullah, it does so for those inmates the "minimum" or "general" population.  *Doc. 37,* Exh. 25.[7]  Because Plaintiff is housed in administrative segregation, I confine my analysis solely to the administrative segregation setting.

---

[7] Defendants do not explain when the congregate Muslim services were instituted.  The documents they submitted are dated March 2002.

### A. *Prisons Can Restrict Congregate Services For Inmates In Administrative Segregation*

Federal constitutional law concerning whether a prison can infringe on the free exercise of religion is long-standing. Any such restriction is evaluated under the *Turner v. Safely* "reasonableness" factors analysis. 482 U.S. 78, 89-91 (1987); *see also e.g., Beerheide v. Suthers,* 286 F.3d 1179 , 1185 (10th Cir. 2002); *Mosier v. Maynard,* 937 F.2d 1521, 1525 (10th Cir. 1991). The factors to consider are:

> (1) whether a valid and rational connection exists between the policy and a legitimate governmental interest advanced as justification; (2) whether, notwithstanding the policy, alternative means exist for the prisoner to exercise the right; (3) what effect an accommodation would have on guards, inmates and prison resources; and (4) whether an alternative is available which would accommodate the prisoner's rights at a *de minimis* cost to valid penological interests.

*Mosier,* 937 F.2d at 1525 (citing *Turner,* 482 U.S. at 89-91).

Security is one such justification.[8] Because "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," *Turner,* 482 U.S. at 84 (internal quotations omitted), and should not become unnecessarily involved in day-to-day affairs of prison administration, *id.* at 89, "in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to [security] considerations, courts should ordinarily defer to [prison administrators'] judgment in such matters," *id.* at 86 (internal quotations omitted). The same is true regardless of whether the inmate's claim is based on the First Amendment.

---

[8] In an unpublished decision in the Tenth Circuit, for example, a panel found the asserted security rationale for a Muslim inmate in federal administrative custody was "compelling" and, therefore, the inmates' inability to attend congregate Jumu'ah services did not violate the Religious Freedom and Restoration Act of 1993. *Malik v. Kindt,* 107 F.3d 21, 1997 WL 39429 (10th Cir. 2/3/07).

> Under the free exercise clause of the first amendment, an inmate must be accorded a reasonable opportunity to pursue his religion. *Cruz v. Beto,* 405 U.S. 319, 322 (1972). However, what constitutes a reasonable opportunity must be evaluated with reference to legitimate penological objectives of the prison; consequently, the reasonableness inquiry is less restrictive than what ordinarily might apply. *O'Lone,* [482 U.S. at 349]. What might be viewed as an unreasonable infringement of a fundamental constitutional right were it to occur outside of prison may be valid in prison as long as the infringement is reasonably related to legitimate penological objectives, which include rehabilitation, deterrence and security. *Id.* at 348-49. ***Given a prison's need to constrain antisocial and potentially violent conduct, the latter objective frequently is determinative of accommodation issues.***

*Id.* (emphasis added); *see also O'Lone,* 482 U.S. at 353 ("We take this opportunity to reaffirm our refusal, even where claims are made under the First Amendment, to 'substitute our judgement on . . . difficult and sensitive matters of institutional administration.'").

Insofar as Plaintiff asserts that precluding him from participating in congregate services violates the right to free exercise of religion, the claim fails. The vast majority of federal decisions confronting the issue have long held that it is constitutionally permissible to entirely prohibit group religious services for those in administrative or similar segregated custody, "so long as inmates rights of conscience are not infringed and they can request individual religious counseling." *Walker v. Mintzes,* 771 F.3d 920, 930 (6th Cir. 1985) (general population inmates in lock down status after riot is "similar to that in administrative segregation units where prisoners who present greater security problems are incarcerated"). This is so because of the safety and security reasons that give rise to the necessity for administrative segregation in the first place.[9]

---

[9] In addition to the decisions cited in *Walker,* see also *Otey v. Best,* 680 F.2d 1231, 1233 (8th Cir. 1982) (reviewing decisions and affirming conclusion that Muslim inmate in administrative segregation could not attend congregate Jumu'ah services); *Frost v. Agnos,* 1992 WL 307927 (9th Cir. 1992) (prohibiting security risk inmates in "close custody" from "attending congregate religious services is

In the instant case, Defendants have submitted the current "Table of Services" which limits religious activity for inmates, like Plaintiff, classified at Level V and above. *See Doc. 33* at Exh. 23, *Doc. 37* at ¶ 6. The same restrictions apply regardless of which "step" the prisoner has obtained. *See Table of Services* at 4.[10] The Table provides that Level V inmates are allowed a "volunteer religious advisor approved by Warden," chaplain visits, and religious TV programs in addition to the religious items they may keep in their cells. *Doc. 33* at Exh. 23. Since at least March of 2002, Muslim inmates in administrative segregation may receive visitations with Amin Abdullah.[11] Even with the restrictions, Plaintiff retains other avenues of exercising his religion that would defeat his claim if it were premised solely on a blanket denial of congregate religious services to inmates in administrative segregation. However, there is also an equal protection aspect to this claim that cannot be so easily resolved.

### B. Plaintiff's Equal Protection Claim Regarding Free Exercise of Religion

---

logically connected to the legitimate penological interests of security and safety" and inmates retained alternative means of exercising religion); *Buckley v. Dallas County,* 2000 WL 502845 (N.D. Tex. 2000) (granting summary judgment on claim that inmate in protective custody was not permitted to attend congregate religious services); *Paamo v. Smith,* 1992 WL 72117 (D. Kan. 1992) (inmate in protective custody was not denied "all possibility of services" therefore claim regarding inability to attend congregational services failed); *but see Williams v. Lane,* 851 F.2d 867, 878 (7th Cir. 1988) (denial of "communal worship, religious instruction, and private religious counseling" for inmates in protective custody "did not bear an adequate relationship to legitimate penological interests" because district court discredited asserted security interest and was able to "offer some easily available and obvious options"), *cert. denied,* 488 U.S. 1047 (1989); *and Salahuddin v. Coughlin,* 999 F.Supp. 526, 535-36 (S.D.N.Y. 1998) (under Second Circuit law, inmates in "keeplock" disciplinary confinement are entitled to congregate religious services, and inmate offered evidence that non-Muslim inmates in keeplock were not permitted to attend congregate services).

[10] Additional restrictions on religious activity apply when an inmate is going through the 7-day orientation period to administrative segregation or what appears to be a disciplinary period while in administrative segregation, both of which are inapplicable here.

[11] He is permitted in the "North" and "South" units. *Doc. 37,* Exh. 25.

Plaintiff further contends that he and other Muslim inmates are not permitted to engage in congregational services while similarly-situated Native American inmates are allowed congregate sweat lodge services. Brown argues that the disparate treatment violates his right to free exercise of religion. *See Complaint,* ¶¶ 70-78. This claim is pending against the Defendant Department for injunctive purposes only. *See Doc. 10* at 2, n.1.

In a July 2001 letter, Brown requested that the prison accommodate the Muslim prisoners in the same way it had the Native American prisoners and grant him permission to conduct and hold congregate Jumu'ah services on Fridays for inmates in the "South" facility. His letter thus implies that Native American inmates in administrative segregation were permitted to engage in congregate sweat lodge activities. The letter was sent to a number of people, including the grievance office, the chaplain, wardens, and director of prisons. *See Doc. 25,* Exh. B at 8, 9, 12 (duplicated at *Doc. 20,* Exhs. H-I). His request was denied.

The Supreme Court has held that a while prison need not provide "a special chapel or place of worship . . . for every faith regardless of size," it must afford reasonable opportunities "comparable to the opportunity afforded fellow prisoners." *Cruz v. Beto,* 405 U.S. 319, 322 n.2 (1972). Even so, equal protection claims in the prison "free exercise of religion" context are also analyzed under *Turner.* Where the prisoner makes a *prima facie* showing of intentional disparate treatment among different religious groups, the court must analyze the prison's reasons for the difference in treatment under the above *Turner* factors. *See Patel v. Wooten,* 15 Fed. Appx. 647, 650-51 (10th Cir. 7/12/01) (Hindu prisoner claimed he was not provided with meat substitute as were Jewish and Muslim inmates; allegations raised disparate treatment claim and case remanded for analysis of *Turner* factors).

15

### *C. Free Exercise/Equal Protection Claim Survives At This Juncture*

According to Defendants, the current and applicable Table of Services is the one dated effective as of May 29, 2001,[12] and it reflects a change in the sweat lodge policy in response to an unidentified still-pending lawsuit. *Doc. 23* at 13 (Affirmative Defense, ¶ 13.d.). However, these regulations ***broadened*** the congregate rights of Native Americans in administrative custody for those who have achieved Step 4 or 5. As opposed to continuing the "no congregate whatsoever" rule apparently previously in place, the current regulations now provide that sweat lodge services "***may*** be congregate as approved by the Warden." *See Table of Services* (emphasis added).[13]

Plaintiff's July 2001 letter requesting congregate Jumu'ah services for inmates in the

---

[12] This is the date reflected on the footer to the Table of Services. It is the latest date the Table went into effect since the policy it is attached to was effective April 30, 2001.

[13] According to Defendants, in early 2001, "Native American inmates were permitted individual access to a sweat lodge once every 45 days and no congregate access was permitted." *Id.* (Affirmative Defense, ¶ 13.b.); *see also Docs. 1, 20, 25*. Also according to Defendants, Plaintiff tendered to them an outdated "Table of Services" exhibit labeled U-2(2) with his Complaint reflects that past "no congregation whatsoever" policy. *See Doc. 23* at 12. That exhibit is not in the court record. Defendants assert that when a Native American inmate in administrative custody challenged the no congregate sweat lodge policy, state district court Judge Stephen Pfeffer found it constitutional under *Turner,* given that the inmates had "limited access to the sweat lodge." *Id.,* Exh. A (*Chavez v. LeMaster,* D-0101-CR-9900896, Final Order On Habeas Petition dated 8/14/02) (hereinafter "*Chavez Final Order*") ¶¶ 11, 15, 17); *see also id.,* at 12 (¶ 3.c.).
   Judge Pfeffer's August 14, 2001, opinion does not specify what set of regulations he was reviewing, and his decision post-dates the regulations Defendants claim assert are the current and applicable ones. Rather than codify Judge Pfeffer's position, however, the Defendants apparently continued on with the May 29, 2001 policy of permitting sweat lodge congregated participation if approved by the Warden.
   Defendants ask this court to take judicial notice that Judge Pfeffer held the prison can deny congregate activity to administrative custody inmates and apparently want the court to deny the claim on that basis. Even if I were to take judicial notice, Judge Pfeffer's decision simply does not deal with the equal protection aspect of the claim presented here. There is no question that on the record now before me, Native American inmates in administrative segregation have a possibility of engaging in congregate religious services while similarly-situated Muslims do not.

16

"South" unit was submitted after the May 29, 2001 regulations went into effect. Acting Associate Warden Shannon McReynolds in a memorandum dated July 18, 2001 denied the request and explained that the prison had provided congregate sweat lodge services in order to comply with the Native American Counseling Act.[14] McReynolds also noted, however, that a state court judge had since held that the prison could "deny congregate religious activity in a Level V or Level VI facility based on security reasons" without violating the constitution or the Native American Counseling Act. *Doc. 20* at Exh. I; *see also supra,* note 13. In light of that decision, McReynolds stated

> the department's practice . . . of letting Native American religious practitioners have congregate sweat lodge is under re-evaluation. When the department makes a policy statement regarding this, it will be published in policy. Until then, your request for congregate religious activity is denied.

*Id.*[15]

Although the McReynolds memorandum indicates that the policies were under review, and intimating that the prison may revert back to the "no congregate whatsoever" rule for all inmates in administrative segregation, no such action is apparent on the present record. Brown's

---

[14] In 1983, the State of New Mexico enacted the "Native American Counseling Act" or "NACA." *See* N.M. STAT. ANN. §§ 33-10-1 - 33-10-4. NACA policy states that the state corrections department afford "Native American religions . . . the same standing and respect as Judeo-Christian religions . . . ***to the extent that it does not threaten the reasonable security of the corrections facility.***" *Id.,* § 33-10-4 (A) (emphasis added). To carry out that policy, NACA states that, upon the request of an Native American inmate or group of inmates, the state correctional facility provide at least six hours a week access to: spiritual advisors; physical materials used for ceremonies such as feathers except peyote; and sweat lodges. *See id.,* §§ 33-10-4 (B) (1) - (2).

[15] The McReynolds memorandum gives rise to some confusion. In their Reply, Defendants state that McReynolds' "description of congregate religious activities . . . may have been correct on July 18, 2001," however, they rely on the May 29, 2001 Table of Services as the "more complete and current." *Doc. 37* at ¶ 7.

17

responses to Defendants' Answer and *Martinez* Report suggest that permission is indeed being granted for Native Americans in administrative segregation to congregate.[16] He further complains that "not allowing other faiths [to] have congregate religious activities violates the establishment of religion clause of the First Amendment." *Doc. 36* at 82.

In their Reply, Defendants urge the court to reject the claim because Plaintiff requested to conduct, and not merely participate in, the Jumu'ah service. Read in context, however, Brown's request was not that narrow. Furthermore, neither McReynolds nor Deputy Secretary of Operations John Shanks denied the request on that basis. McReynolds adopted a wait-and-see

---

[16] Native American inmates . . . participate in sweat lodge activities in the high security facility, but Muslim Islamic inmates are denied the same quality venue to hold Muslim congregational religious services . . . .

Muslim inmates have no alternative way of attending Muslim Jumu'ah prayers. They cannot meet together at any time to worship like the Native American inmates.

\* \* \* \* \*

Prison officials seemed to give no thought to the resentment ensuing when the Muslim inmates, denied the opportunity of participating in their religious Jumu'ah prayers but prison officials making arrangement to enable the Native American inmates to attend their own group congregational worship services.

Plaintiff alleges that this veto subjected him to a different standard than other similarly situated prisoners and that no rational basis for such treatment existed. Prison officials cannot explain that their custom or policy is rationally related to security concerns because they allow other prisoners access to congregational religious worship.

Defendant states that plaintiff alleges that all Native American inmates are entitled to participate in congregate sweat lodge activities regardless of their custody level. Plaintiff was stating that the Native American inmates had congregate sweat lodge activities before the implementation of the level system provision of religious access to Level VI and VI!

*Doc. 36* at 79-80; *see also Doc. 24,* at ¶¶ 40-42.

18

approach, stating that the policies were under reevaluation.  When Plaintiff's letter reached Shanks in the form of a grievance, Shanks construed it as being brought on behalf of other inmates.  Because such a grievance is not permitted under department regulations, Shanks denied it on that procedural basis alone.  *See Doc. 25,* Exh. B.  Neither McReynolds nor Shanks reached the merits of Brown's request.

Thus, the present record sets forth a colorable disparate treatment claim.  Defendants have not submitted any evidence showing when, whether, and to what extent Native American inmates in administrative segregation were or are permitted to congregate sweat lodge ceremonies.  No details of such congregate services have been given such as whether the congregate sweat lodge activity excludes inmates from the general population, whether other Step 4 administrative custody inmates besides the Native Americans and Muslims have requested congregate services, and whether or not any such request was granted.  I also cannot ignore that some nonreligious congregate activities are already available to Step 4 inmates, and it is not clear from the record whether those activities are solely within the administrative segregation unit.  These are but some of the facts that may be relevant and material to the disparate treatment claim.

There may be legitimate reasons why the regulations and practice under them prohibit congregate religious services for Muslim and other non-Native American inmates in administrative segregation, while maintaining the availability of congregate services for Native Americans and permitting other group activities for inmates in administrative segregation.  However, Defendants have not tendered any. In addition, the record reflects that Plaintiff was transferred to the Southern New Mexico Correctional Facility after the briefing was completed.  Accordingly, Defendants should file a supplemental *Martinez* Report, complete with a motion for summary

19

judgment, that discusses whether the claim is moot due to Plaintiff's transfer, and if not, that thoroughly documents and discusses the claim, including the establishment clause allegation.

Wherefore,

**IT IS HEREBY RECOMMENDED** that Plaintiff's First Claim (Ramadan meal) and remaining portion of this Third Claim (administrative segregation) should be dismissed.

**IT IS FURTHER RECOMMENDED** that in conjunction with dismissal of his First Claim, the remaining individual defendants should be dismissed. The only remaining Defendant will be the Department, and for injunctive relief only. *See Doc. 10* at 2, n.1.

**IT IS FURTHER ORDERED** that the remaining Defendant submit a supplemental *Martinez* Report on Plaintiff's Second Claim as set forth above on March 28, 2003. Plaintiff's response is due April 28, 2003. Defendant's reply is due May 26, 2003.

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). **A party must file any objections with the Clerk of the District Court within the ten day period if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.**

_____
UNITED STATES MAGISTRATE JUDGE